Decided 8 July, 1901.

## STATE *v.* COLUMBIA GEORGE.

[ 65 Pac. 604.]

INDIANS—CRIMES ON RESERVATIONS*—STATUTES.

The act of congress of eighth February, 1887 (24 Stat. 388, c. 119), commonly called the Dawes Act, allotting public lands to Indians, and declaring that allottees to whom such lands shall be patented shall be subject to the laws of the state of their residence, and shall be citizens of the United States with all the rights, privileges, and immunities of such citizens, does not repeal or modify the act of third March, 1885 (23 Stat. 362, c. 341, Supp. Rev. Stat. p. 482, c. 341), which provided that Indians who should thereafter commit certain named offenses on a reservation should be tried by the federal courts; wherefore an allottee on the Umatilla Indian Reservation, in Oregon, charged with any offense enumerated in the act of third March, 1885, is triable only in the federal courts.

From Umatilla :  WILLIAM R. ELLIS, Judge.

*NOTE.—See *Pablo* v. *People*, 23 Colo. 134, 46 Pac. 636, 37 L. R. A. 636, for a discussion of the jurisdiction of state courts over Indians for offenses committed beyond the limits of a reservation, and *Stacy* v. *La Belle*, 99 Wis. 520, 75 N. W. 60, 41 L. R. A. 419, 67 Am. St. Rep. 879, note, discussing the jurisdiction of the state courts over Indians in civil cases.— REPORTER.

Columbia George appealed from a conviction of murder and a sentence of death.         REVERSED.

For appellant there was a brief over the names of *Wm. Parsons, Carter & Raley*, and *R. J. Slater*, with an oral argument by *Mr. Parsons* and *Mr. Slater*.

For the state there was a brief and an oral argument by *Messrs. Thos. G. Hailey*, District Attorney, and *D. R. N. Blackburn*, Attorney-General.

MR. JUSTICE WOLVERTON delivered the opinion.

The defendant, Columbia George, was jointly indicted with Toy Toy, but separately tried and convicted of the crime of murder in the first degree, committed on the United States Indian Reservation in Umatilla County, Oregon, and this appeal is from the judgment rendered in pursuance thereof. Both defendants are Indians of the Umatilla tribe, allottees of the reservation lands, and resided thereon at the time of the commission of the offense. The deceased, known as "Anna Edna," was an Indian woman, and, although an allottee, she did not live at the time upon her own allotment, but upon that of another Indian woman.

The defendant challenges the jurisdiction of the court to try the cause upon the ground that the general government has jurisdiction thereof to the exclusion of the state courts. Under the view we entertain of this proposition, it is unnecessary to examine any other question brought up by the record. There is a grave responsibility imposed upon every court to be very sure that it is the law that condemns, and not the court, except as the correct and impartial instrumentality of the law ; and in no case is this humane principle so impressively discovered to the understanding as where the life of a

human being is suspended in the balance, whether the subject be of high or low degree. Yet, if the law condemns, its judgments should be certain, so as to insure respect, and an obedient observance of its behests. The law by which it is claimed the general government has assumed jurisdiction of the crime involved is section 9 of the act of March 3, 1885 (1 Supp. Rev. Stat. 482, c. 341, 23 Stat. 362, c. 341), which reads as follows: "That immediately upon and after the date of the passage of this act all Indians committing against the person or property of another Indian or other person any of the following crimes, namely: murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny within any territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such territory relating to said crimes; and shall be tried therefor in the same courts and in the same manner and shall be subject to the same penalties as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases. And all such Indians committing any of the above crimes against the person or property of another Indian or other person within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

Prior to this enactment, federal jurisdiction over Indian reservations as to crimes committed by Indians thereon, was dependent upon sections 2145, 2146, Rev. Stat. U. S. and other provisions of Title XXVIII, Rev. Stat. U. S.,

39 OR.—9.

touching Indian affairs, of which they are a part. These
sections read as follows :—

" Sec. 2145. Except as to crimes the punishment of
which is expressly provided for in this title, the general
laws of the United States as to the punishment of crimes
committed in any place within the sole and exclusive
jurisdiction of the United States, except the District of
Columbia, shall extend to the Indian country.

" Sec. 2146. The preceding section shall not be con-
strued to extend to [crimes committed by one Indian
against the person or property of another Indian, nor
to] any Indian committing any offense in the Indian coun-
try who has been punished by the local laws of the tribe,
or to any case where, by treaty stipulations, the exclusive
jurisdiction over such offenses is or may be secured to the
Indian tribes respectively."

That part of section 2146 comprised in brackets above
was a part of the original act of March 27, 1834 (10 Stat.
270, c. 26, § 3). It was omitted in the revision thereof,
but was restored by the act of February 18, 1875 (18 Stat.
318, c. 80), and now appears in the second revised edition.

There has been much discussion among the authorities
as to what constitutes Indian country within the purview
of said section 2145, but the latter clause of section 9 of
the act of 1885 (the one with which we are concerned)
restricts the jurisdiction to Indian reservations, and there
can be no dispute, that at the time of its enactment Uma-
tilla Reservation fell within its meaning and purpose.
The inquiry is as to the effect of concurrent and subse-
quent enactments, and the acts of the government and
the Indians in pursuance thereof, in the way of disan-
nulling or extinguishing the reserve as Indian country
and withdrawing federal jurisdiction. It is unnecessary,
therefore, to determine what is Indian country, or whether
an Indian reservation falls within the designation. It was

early the policy of the government to treat the various
Indian tribes found within the territory as quasi inde-
pendent peoples and nations, but under the protection
and tutelage of the general government.   They were rec-
ognized as having the possessory right to the soil over
which they were wont to hunt and exercise a primitive
authority, but not the ultimate title to the land itself.
Of the latter they were denied ownership, and were not
permitted to sell or dispose of it to any person or nation
without the consent of the United States.   They were
never regarded as citizens or constituent members of our
body politic with the rights and privileges of citizenship,
and were subjects only in a restrictive sense.   They were
amenable generally, when without the Indian country, to
the laws of the United States and of the state and territory
where they may be within their respective jurisdiction,
but were permitted to maintain their separate, independ-
ent communities and political organizations or primitive
tribal relations for the government of their own people.
In permitting this, they were treated as wards in a state
of pupilage, emerging from their savage condition to a
higher civilization ; and it was thought to be the better
means to the end, while instructing them in the arts of
industry and civilization, that they should be encouraged
to become self-governing, as well as self-supporting : *Wor-
cester* v. *Georgia*, 31 U. S. (6 Pet.) 515, 536 ; *Ex parte Crow
Dog*, 109 U. S. 556 (3 Sup. Ct. 396); *United States* v. *Ka-
gama*, 118 U. S. 375 (6 Sup. Ct. 1109).

It was in pursuance of this policy of permitting differ-
ent Indian nationalities and tribes to govern themselves,
and in recognition of the amenability of the individuals
thereof to their own domestic and peculiar rules and
regulations, that it was enacted that the general laws
touching the punishment of crimes committed within the
exclusive jurisdiction of the United States, which were

extended to the Indian country, should not be construed to include crimes committed by one Indian against the person or property of another, nor to any Indian committing any offense in the Indian country, who had been punished therefor by the local laws of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively. Accordingly, upon the trial of *Ex parte Crow Dog*, 109 U. S. 556 (3 Sup. Ct. 396), which involved the jurisdiction of the court to try an Indian of the Brule Sioux band of the Sioux nation for the murder of another Indian of the same band, committed within the Indian country, it was held that the court was without jurisdiction of the offense. The government had in 1868 entered into a treaty with the tribes of the Sioux Indians, whereby it was stipulated, among other things, that, if a bad man among the Indians should commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the tribe should surrender the wrongdoer to be tried and punished according to the laws of the United States ; and in 1877, in pursuance of a subsequent agreement with such Indians, it was enacted that the provisions of said treaty of 1868, except as modified, should continue in full force, and that congress, by appropriate legislation, should secure to them an orderly government ; that they should be subject to the laws of the United States, and each Indian should be protected in his rights, property, and life ; and it was urged that the treaty stipulations and the act of congress had repealed by implication the clause of section 2146, excepting from the jurisdiction of the United States crimes committed by one Indian against another, but the court was of the opinion that such was not the intendment of either the treaty or of the act of congress,

and therefore refused to entertain jurisdiction of the offense, because it was a matter that had been left to be dealt with by the Indians themselves.

As touching this early policy of the government, Mr. Justice MATTHEWS, in delivering the opinion of the court, says : "If the question has been mooted heretofore in any courts of the United States, the jurisdiction has never before been practically asserted as in the present instance. The provisions now contained in sections 2145 and 2146 of the Revised Statutes of the United States were first enacted in section 25 of the Indian intercourse act of 1834 (4 Stat. p. 733). Prior to that, by the act of 1796 (1 Stat. p. 469) and the act of 1802 (2 Stat. p. 139), offenses committed by Indians against white persons and by white persons against Indians were specifically enumerated and defined, and those by Indians against each other were left to be dealt with by each tribe for itself, according to its local customs. The policy of the government in that respect has been uniform." To the same purpose he quotes from the opinion of Mr. Justice MILLER, in *United States* v. *Joseph*, 94 U. S. 614, 617, as follows : "The tribes for whom the act of 1834 was made were those semi-independent tribes whom our government has always recognized as exempt from our laws, whether within or without the territorial limits of an organized state or territory, and, in regard to their domestic government, left to their own rules and traditions ; in whom we have recognized the capacity to make treaties, and with whom the governments, state and territorial, deal, with a few exceptions only, in their national or tribal character, and not as individuals." So, the court say in *Ex parte Mayfield*, 141 U. S. 107 (11 Sup. Ct. 939): "The policy of congress has evidently been to vest in the inhabitants of the Indian country such power of self-government as was thought to be consistent with the safety of the white population with

which they may come in contact, and to encourage them as far as possible in raising themselves to our standard of civilization." See, also, *Alberty* v. *United States*, 162 U. S. 499 (16 Sup. Ct. 864). In more recent years, however, the government, induced, no doubt, by experience, has deemed it wise to encroach more or less upon the right and authority of the tribes to exist and operate as independent communities and governments, with the ultimate purpose of reducing the Indians to individual accountability to the laws of the country so far as it was consistent with existing treaty obligations. This is apparent from Section 2079, Rev. Stat. U. S., adopted March 3, 1871, whereby it is declared that "no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty," reserving inviolate, however, all prior treaty obligations ; the effect of which was to require the Indian tribes to be dealt with in the future through the legislature, and not through the treaty-making power : *Elk* v. *Wilkins*, 112 U. S. 94, 107 (5 Sup. Ct. 41). Agreements were subsequently entered into with the Indians, but before they could become effective as law they were required to be ratified by act of congress. And it was in pursuance of the purpose of finally securing individual accountability that section 9 of the act of March 3, 1871, was adopted.

The validity of this particular section was challenged in the case of *United States* v. *Kagama*, 118 U. S. 375 (6 Sup. Ct. 1109), upon constitutional grounds ; and this led to a consideration also of the relative jurisdiction of the state and national courts touching crimes committed by Indians upon Indian reservations. The case arose upon an accusation against two Indians charging them with murder of another upon the Hoopa Indian Reservation in

the State of California, and it was held that, while the con-
stitutionality of the law could not be maintained under the
power to regulate commerce with Indian tribes, yet that
the general government had the right and authority to
govern the Indians by act of congress, instead of through
treaty regulations, they being within the geographical
limits of the United States, and being necessarily subject
to the laws which congress might enact for their protection
and the protection of the people with whom they may come
in contact.    Mr. Justice Miller, discussing the matter,
asks the question whether the fact that the statute includes
crimes committed on reservations lying within a state is
a fatal objection to the law ; then answers it in this wise :
" The statute itself contains no express limitation upon
the powers of a state or the jurisdiction of its courts.    If
there be any limitation in either of these, it grows out of
the implication arising from the fact that congress has
defined a crime committed within the state, and made it
punishable in the courts of the United States.    But con-
gress has done this, and can do it, with regard to all
offenses relating to matters to which the federal authority
extends"; and closes the opinion with the following sig-
nificant declaration :  " The power of the general govern-
ment over these remnants of a race once powerful, now
weak, and diminished in numbers, is necessary to their
protection, as well as to the safety of those among whom
they dwell.    It must exist in that government, because it
never has existed anywhere else, because the theater of
its exercise is within the geographical limits of the United
States, because it has never been denied, and because it
alone can enforce its laws on all the tribes "—thus indi-
cating as distinctly as can be that the jurisdiction extended
to the federal courts by congress over the enumerated
crimes committed by Indians while continuing in their
tribal relations upon Indian reservations is exclusive of

that of the state courts. *United States* v. *Thomas*, 151 U. S. 577 (14 Sup. Ct. 426), involved an accusation in the federal court against an Indian of the Chippewa tribe of the murder of a half-breed of the same tribe within the limits of La Court Oreilles Indian Reservation in Wisconsin. The defense was that the crime was committed upon a school section within the reservation, and therefore that the state, and not the national, court had jurisdiction of the cause ; but it was determined that the state took its title upon its admission into the Union subject to the possessory title of the Indians, and, until that had been extinguished, the federal court had jurisdiction throughout the confines of the reservation.

A like question arose in the State of Minnesota (*State* v. *Campbell*, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169*), upon the indictment of Mary Campbell and John Belonge for the crime of adultery committed therein upon the White Earth Reservation. Belonge and Campbell were both living upon the reservation ; Campbell being a half-breed, but the wife of a white man, whom she deserted. The state court considered that she was not a tribal Indian, while Belonge was, and retained jurisdiction of the offense as to her, but not as to Belonge. The crime is not one of these enumerated in section 9 of the act of 1885 (23 Stat. 362, c. 341), but the court, commenting upon such conditions, observes that "presumably, congress has enumerated all the acts which, in their judgment, ought to be made crimes when committed by Indians, in view of their imperfect civilization. For the state to be allowed to supplement this by making every act a crime on their part which would be such if committed by a member of our more highly civilized society, would not only be inappropriate, but also practically to

*See note, Jurisdiction to Punish Crimes committed by or against Indians.

arrogate the guardianship over these Indians, which is
exclusively vested in the general government." Again,
it was held in *Ex parte Cross*, 20 Neb. 417 (30 N. W. 428),
— a case of "horse stealing" in Nebraska,— that the
courts of the state have no authority to prosecute and
punish an Indian for a crime committed against another
on the reservation to which each belongs, so long as they
maintain their tribal relations.   See, also, *United States*
v. *King* (D. C.), 81 Fed. 625.

It is very clear, therefore, from the policy of the general
government and its acts, and the interpretation thereof
by the courts, both state and national, that the federal
courts have jurisdiction of the crime of murder com-
mitted by one Indian against another upon an Indian
reservation, although within state boundaries, to the
exclusion of the state courts.   While this is true, it is
also true, the state having been admitted into the Union
upon an equal footing with the other states, without ex-
clusion of jurisdiction as to crimes committed on Indian
reservations, other than those by Indians against Indians,
that the courts are vested with jurisdiction to try and
punish such crimes to the exclusion of the federal courts :
*United States* v. *McBratney*, 104 U. S. 621 ; *Draper* v. *United
States*, 164 U. S. 240 (17 Sup. Ct. 107) ; *United States* v.
*Ward*, 1 Woolw. 17 ( Fed. Cas. No. 16639 ) ; *United
States* v. *Thomas*, 151 U. S. 577 (14 Sup. Ct. 426).   The
former of these cases involves the murder of and by a
white man, and the next of a negro by a negro, upon
a reservation within state boundaries, and in each it was
held that the United States court was without jurisdic-
tion of the offense.   In the latter the court applied the
doctrine of the *Kagama Case*, quoting from Mr. Justice
Miller, wherein he declared that the act extending juris-
diction of the United States over Indian offenses "does
not interfere with the process of the state courts within

the reservation, nor with the operation of the state laws upon white people found there.   Its effect is confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation.'' Thus we have defined very clearly, by judicial interpretation, the limits of the correlative criminal jurisdiction of the courts of the United States and of the states.

But it is insisted that the defendant and deceased were not tribal Indians at the time of the commission of the crime charged, because they were allottees under a special act of congress, and a subsequent general act extended to them citizenship with all the rights, privileges, and immunities of citizens of the United States.   We will now examine the effect of the acts alluded to in so far as they seem to have application here.   By the treaty of June 9, 1855, the confederated tribes of Walla Walla, Cayuse, and Umatilla Indians were settled upon the Umatilla Reservation, and have since continued in its entire occupation, except as relinquished by their consent.   By an act of March 3, 1885 (23 Stat. 340, c. 319), the said confederated tribes having expressed a willingness to settle upon lands in severalty, congress provided for an allotment, setting forth in detail the manner in which it should be accomplished.   Preliminarily, a commission was appointed to ascertain the number of Indians entitled to take lands in severalty, and the amount of land required for the purpose, and thereupon to determine and set apart so much of the reservation as should be necessary to supply agricultural lands for allotments in severalty, together with sufficient pasture and timber lands for their use, and six hundred and forty acres for an industrial farm and school, not to exceed one hundred and twenty thousand acres in the aggregate for all purposes, the same to be in as compact form as possible, and to make report to the secretary of the interior, which, if confirmed, the tract so ascer-

tained and set apart should thereafter constitute the reservation for such Indians, within which allotments should be made. It was further provided that, when allotments were made, patents should issue declaring the United States to hold the lands thus allotted for the period of twenty-five years in trust for the sole use and benefit of the Indians, and that at the expiration of such period it will convey the same in fee by patent, discharged of the trust. The surplus lands were required to be appraised, classified, and sold, and by section 5 it was provided that, before the act should be executed in any part, the consent thereto of the Indians should be obtained in writing. This was a special act affecting only the Umatilla Reservation and the Indians stationed thereon.

On February 8, 1887, however, congress enacted a general allotment law, known as the '' Dawes Act '' (24 Stat. 388, c. 119), providing for allotments to be made, when directed by the president, under special agents appointed for the purpose ; the selection to be made by the Indians themselves. Section 4 of the act provides '' that where any Indian not residing upon a reservation, or for whose tribe no reservation has been provided by treaty, act of congress, or executive order, shall make settlement upon any surveyed or any unsurveyed lands of the United States not otherwise appropriated, he or she shall be entitled, upon application to the local land office for the district in which the lands are located, to have the same allotted to him or her, and to his or her children, in quantities and manner as provided in this act for Indians residing upon reservations.'' Section 5 provides for the issuance of patents to the allottees by the secretary of the interior, in legal effect the same as required by the special act, with the further provision that the president may in any case, in his discretion, extend the period of trust relations, and that any conveyance or contract made of or concerning

the allotted lands in the mean time shall be absolutely void; and section 6 provides "that upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provision of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States, without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property." Two ideas are advanced touching these acts, in support of the jurisdiction of the state court to try the offense charged. The first is that, by reason of the allotments under the act of 1885, the Umatilla Reservation was broken up,—that is to say, the Indians were given their lands in severalty, which they have accepted, thus depriving them of whatsoever community rights they previously had in the whole, and withdrawing the territory as a government reserve for their exclusive use and benefit; and, second, that the act of 1887, by the first clause of section 6, subjected the members of all tribes to whom allotments had been

made to the laws of the state or territory in which they reside, or, if this is not adequate to the purpose, then, the latter clause of said section having extended citizenship to every Indian to whom allotments have been made, whether under the act or under any other act or treaty, he is thereby as completely subjected to the laws of the state, both civil and criminal, as any other citizen of the United States, whether white or black. We will discuss these in their order.

These two acts are in further development of the policy of the general government as heretofore noted, and contemplate as well the gradual extinction of the Indian reservations and Indian titles. It does not appear, however, from the provisions of the act for the allotment of the Umatilla Reservation, that it was the intention of congress to abandon it, or to relinquish its authority over the territory comprised within its boundaries, or the Indians stationed thereon, while maintaining their tribal relations, when certain of the lands of the reservation should be set apart in severalty. By the terms of the act not all of the lands of the reservation were to be allotted, but only so much as was necessary for agricultural purposes, parceling the same out in quantities as directed by the act. There was to be reserved a reasonable amount of pasture and timber lands, to be used and occupied by them in common. The agricultural lands thus required for the allotments, and the pasture and timber lands and a section for industrial and school purposes, were to be located in one tract in as compact form as possible, which, by special provision, was to constitute thereafter the diminished reservation for said Indians. The allotments were to be made within this new reserve, but there is no purpose discoverable of breaking up the reserve and withdrawing supervision over the Indians as soon as they were made. There is a provision in the act whereby Indians

residing upon the diminished reserve, and desiring to remove therefrom, and take up their home elsewhere, may be permitted to do so under certain conditions ; thus impliedly reserving control over the Indians. This much further may be said, the patents authorized to be issued were required to be of such a character as that the government shall retain the fee, and hold the same in trust for the Indians for the term of twenty-five years ; and the allottee has, by the regulations of the interior department, been prohibited from leasing or otherwise incumbering his lands without the assent of the government ; so that we conclude that the allotments, under the act, have not worked an abandonment or extinguishment of the reservation. Nor do we think that the first clause of section 6 of the Dawes Act operated to extend the laws of the state over this reservation to the exclusion of the United States. This is a general act, and is not effective to modify or repeal any special act, unless it purports by direct provision so to do, or was intended to cover the whole subject-matter, or is so repugnant to the special act that both can not stand. In either of the latter conditions, the result would be a repeal by implication. Almost the identical question was passed upon in *McBean* v. *McBean*, 37 Or. 195 (61 Pac. 418), and the doctrine finds ample support in *Ex parte Crow Dog*, 109 U. S. 556 (3 Sup. Ct. 396), and cases there cited. The language of said first clause of section 6, "that upon the completion of said allotments and the patenting of the lands to the said allottees," has reference to the allotments and allottees under the act, and none other, and hence does not comprehend Indian allottees under other special acts, and therefore can not affect the Umatilla Indians.

The intendment of the latter clause is not so clear, but if it be conceded that the purpose thereof is to extend citizenship by the mere act of allotment, without requir-

ing of the allottees the adoption of the habits of civilized life,—but about which there is some doubt,—the federal courts seem to have considered that such citizenship is not inconsistent with the continuation of tribal existence, relations, and affiliations. In *Beck* v. *Real Estate Co.* 65 Fed. 30 (12 C. C. A. 497), which was a case involving the validity of certain leases executed by Indian allottees of lands upon the Omaha and Winnebago reservations in the State of Nebraska under the Dawes Act, THAYER, circuit judge, says : "It is suggested, as we understand, that because congress conferred the right of citizenship upon all Indians to whom allotments of land might be made, and upon every Indian who should take up a residence separate and apart from his tribe, and adopt the habits of civilized life, the power to sell, lease, and otherwise dispose of allotted lands was also conferred as a necessary incident of citizenship. It is urged, as we understand, that congress could not make these Indians citizens of the United States without at the same time giving to them the unrestricted power to sell, use, and control all property whatsoever in which they chanced to have an interest. This argument appears to us to be untenable. We know of no reason, nor has any been suggested, why it was not competent for congress to declare that these Indians should be deemed citizens of the United States, and entitled to the rights, privileges, and immunities of citizens, while it retained, for the time being, the title to certain lands, in trust for their benefit, and withheld from them for a certain period the power to sell, lease, or otherwise dispose of their interest in such lands." So, in the case of *United States* v. *Flournoy Live Stock & Real Estate Co.* (C. C.) 79 Fed. 886, involving the validity of the same leases, SHIRAS, district judge, says : "The fact, urged in argument, that under the laws of the State of Nebraska the Indians in question, to whom lands

have been assigned in severalty, have the right to vote, and to hold office, does not necessarily show that the government of the United States no longer owes them any duty of protection in regard to the reservation lands, and no longer possesses any power of control over them as a tribe. In the act of congress of February 8, 1887, which declares that Indians holding lands allotted in severalty are to be citizens of the United States, we find the express exception that such citizenship shall 'exist without in any manner impairing or otherwise affecting the right of any such Indians to tribal or other property.' It will also be borne in mind that not all of the Omaha and Winnebago Indians are living upon lands allotted in severalty, nor have all the lands embraced within the boundaries of the reservation been thus allotted. By the express terms of the treaties made with these Indians, the United States assumed the duty of preserving the reservation for use, occupancy, and benefit of the Indians, and this duty is still incumbent upon it; and it is also the fact that the United States still recognizes the continued existence of the Omaha and Winnebago tribes."

This was upon demurrer. Later the case came up on bill and answer (*United States* v. *Flournoy Live Stock & Real Estate Co.* [C. C.] 71 Fed. 576), and the same judge says: "Thus it appears that the questions which are decisive of the case now before the court are questions of law, the pivotal point being whether conferring citizenship upon the Indian allottees freed the lands allotted to them from the restrictions contained in the acts of congress upon the right of alienation, and terminated all right of control on the part of the United States over the reservations, the lands therein, and the Indians occupying the same." After stating that he had no reason to recede from the views entertained when the demurrer was under consideration, he continues, stating his conclusions in the prem-

ises : " I hold that the fact that the Indian allottees are declared to be citizens of the United States does not render null and void as to them, or as to the remaining portion of the Omaha and Winnebago tribes, the restrictions upon the right of alienation contained in the several acts of congress under which allotments in severalty have been made of portions of these reservations.   *   *   *   I further hold that these reservations continue to be Indian reservations ; that the United States has never yet been released from the treaty stipulations and obligations by which it assumed to preserve these lands for the use and benefit of the Indians ; that the United States holds the title to these lands charged with the trust created by the treaties in question, and it is its duty to do whatever is necessary to protect the Indians in the proper use and occupancy thereof ; that the power and right in the United States to do whatever is necessary for the fulfillment of its treaty duties, trusts, and obligations towards the Indians rests upon every foot of soil and upon every individual within the boundaries of the reservation, and this power and right is paramount and supreme.   I further hold that the lapse of time and the allotment of portions of these reservations have not, as claimed by defendants, terminated the tribal relation of the Indians, nor have the Omahas and Winnebagos been taken from under the supervision and control of the interior department of the government."

And in a later case (*United States* v. *Mullin* [D. C.] , 71 Fed. 682), which involved the offense of resisting an officer of the United States, namely, certain Indian police officers upon an Indian reservation, it was held that the government is not relieved from its duties of guardianship and protection of the members of an Indian tribe, assumed by treaty with such tribe, in consequence of the

39 OR.—10.

Indian becoming a citizen of the United States. In perfect accord with these views is the opinion of BELLINGER, district judge, in *United States* v. *Logan* (C. C.), 105 Fed. 240, 241, which was a case of an assault by one Indian against another within the Siletz Reservation, in this state, where allotments had been made, as we understand, under the Dawes Act. He says: "I am of the opinion, further, that the allotment of lands to the defendant does not take the case out of the jurisdiction of this court. The Indians affected by these allotments are still dependent communities. The lands allotted to them continued to be held by the United States, in trust for their benefit. The allottees are still subject to the regulations provided for the government of Indian reservations. Notwithstanding the mandate of the act of congress declaring them citizens, they are still minors in the eyes of the law, incapable of disposing of the lands held by them, or even of leasing them without the consent of the reservation agent; and their dependence is still so complete that it is a crime to sell them whisky or other intoxicants. The rights of the defendant as an allottee of the land are not material. The question of jurisdiction is with reference to the place where the crime was committed, which must be 'within the limits' of a reservation. Unless the allotment took this land out of the reservation limits,—a thing beyond question, and not contended for,—the jurisdiction of the court is not affected by it." Other authorities are to the same purpose: *Pilgrim* v. *Beck* (C. C.), 69 Fed. 895; *Smythe* v. *Henry* (C. C.), 41 Fed. 705; *Eells* v. *Ross* (C. C.), 64 Fed. 417; *State* v. *Denoyer*, 6 N. D. 586 (72 N. W. 1014).

It would seem, therefore, that citizenship, such as extends within the purview of the Dawes Act to Indian allottees, is neither inconsistent nor incompatible with the status of a tribal Indian; that the government, while it

has bestowed citizenship, has not thereby relinquished the guardianship of the tribes, indulging them yet a little while, but with greatly restricted authority, in their primitive government ; and until the general government has taken its hands off, and relinquished supervision over its Indians, the state court can not assume jurisdiction touching the criminal acts of one against another. The condition may appear to be an anomalous one that a person may be admitted to citizenship under one government and yet be permitted to maintain allegiance to another, however primitive that other may be ; but such seems to be the natural outgrowth of the anomalous attitude that the general government has maintained towards the Indian from the beginning. As was said by Shiras, J., in one of the cases above cited :  " It is to be expected that in the effort to advance the Indian from his semi-savage condition, and to change his tribal character into individual citizenship, many anomalous situations will arise, which must be viewed in the light of all the legislation upon the same subject, including the treaties made with the several tribes." The state courts have never had jurisdiction over the Indians within the Indian country or upon Indian reservations, except as and in so far as the general government has relinquished the supervisory control and authority over them. The acts under consideration are not indicative of such a purpose ; hence it follows that the state court is without jurisdiction of the offense charged. The judgment of the court below will, therefore, be reversed, and the cause remanded, with directions to discharge the defendant.   Reversed.