## KALYTON *v.* KALYTON.

[74 Pac. 491, 78 Pac. 332.]

VALIDITY OF INDIAN MARRIAGES — LEGITIMACY OF ISSUE.

1. A marriage between Indians according to tribal custom, followed by cohabitation as husband and wife, is a lawful union under the act of Congress of February 28, 1891 (26 Stat. U. S. 794, c. 383, § 5*), and a child of such a relationship is legitimate for the purpose of determining the descent of land; even though the relationship may have commenced after an allotment of land in severalty under the act of Congress of February 8, 1887, commonly called the "Dawes Act" (24 Stat. U. S. 390, c. 119, § 6†).

EVIDENCE OF INDIAN MARRIAGE.

2. The evidence is satisfactory that the Indian woman Louise married the Indian man Joe Kalyton according to the custom of the Cayuse tribe, of which they were members; that the plaintiff Agnes Kalyton is the lawful issue of that union, though born after her father's death; and, further, that prior to her marriage with Joe Kalyton, Louise was divorced according to the custom of her tribe from all her former husbands.

JURISDICTION MAY BE FIRST QUESTIONED ON APPEAL.

3. Under Section 72, B. & C. Comp., providing that the objection of want of jurisdiction in the court is not waived by failure to demur or answer on that ground, the question may be first suggested on appeal.

INDIAN ALLOTMENTS — EFFECT OF FIRST PATENT.

4. The first patent provided for by the act of Congress of March 3, 1885 (23 Stat. U. S. 340, c. 319, § 1), to be issued to Indian allottees on the Umatilla Indian Reservation is intended to be only a memorandum of the allotment and a declaration of the trust imposed on the United States.

DESCENT OF INDIAN LAND AFTER FIRST PATENT.

5. Between the times of the issuance of the first and second patents to Indian allottees on the Umatilla Indian Reservation provided for by the act of Congress of March 3, 1885 (23 Stat. U. S. 340, c. 319, § 1), an allottee cannot voluntarily alienate the allotted land, or by any act affect the transmission of the title thereof in the course designated by the laws of Oregon. After the issuance of the first patent the land descends as by law provided upon the death of the allottee.

SOURCE OF TITLE OF HEIRS OF ALLOTTEES.

6. *Quære.* Has an Indian allottee on the Umatilla Indian Reservation any estate in the land allotted until issuance of the second patent? And further, if

---

*3 Fed. Stat Ann. 501.    †3 Fed. Stat. Ann. 496.

such an allottee dies before the issuance of the second patent, do the heirs take by inheritance from the allottee or as donees of the United States?

RIGHT OF STATE COURTS TO SETTLE HEIRSHIP OF INDIAN LANDS.

7. A suit to determine who are the heirs of an Indian allottee on the Umatilla Indian Reservation who died between the issuance of the two patents provided for by the act of Congress of March 3, 1885 (23 Stat. U. S. 340, c. 319, § 1), is not a proceeding to enforce the trust reserved by the United States, and is within the jurisdiction of the courts of Oregon. To such a suit the United States is not an indispensable party under the act of Congress of February 6, 1901: 31 Stat. U. S. 760*.

From Umatilla: WILLIAM R. ELLIS, Judge.

This is a suit by Agnes Kalyton, a minor, by her mother, as guardian *ad litem*, to establish her right to certain real property. The transcript shows that about April 21, 1891, Joe Kalyton, an Indian, and a member of the Cayuse tribe, was allotted in severalty 157 acres of land in the Umatilla Indian Reservation. He thereafter lived with the plaintiff's mother, and died intestate about January, 1899, seised of the real property allotted to him, and after his death the plaintiff was born. The defendant Mary Kalyton, his sister, claiming to be his sole heir, took possession of the premises in question, and secured the rents therefrom. The complaint, after alleging the facts, in substance, as hereinbefore stated, avers that about 1893 plaintiff's mother married Kalyton according to the customs and laws of the tribe to which they belonged; that thereafter they lived and cohabited as husband and wife; and that plaintiff is the issue of such marriage, and the sole heir of the deceased. The answer denies the material allegations of the complaint, and, for a further defense, avers that the alleged marriage was not performed according to law, and therefore was void. For a further defense, it is averred that Kalyton and plaintiff's mother, being allottees of land in severalty, were citizens of this State, and that he died unmarried and without lineal descendants. A demurrer to the first separate defense having been over-

*3 Fed. Stat. Ann. 503, 504.

ruled, a reply was filed putting in issue the averments of new matter in the answer, whereupon a trial was had, resulting in a decree that the defendant Mary Kalyton was the sole heir of the deceased, and entitled to the real property of which he died seised, and the plaintiff appeals.

REVERSED.

For appellant there was a brief and an oral argument by *Mr. Henry J. Bean.*

For respondent there was an oral argument by *Mr. Thomas G. Hailey,* with a brief to this effect.

Indians to whom allotments of land in severalty have been made under any law or treaty have the benefits of and are subject to the laws, both civil and criminal, of the state or territory in which they may reside, and are citizens of the United States, and entitled to all the rights, privileges, and immunities of such citizens. Such Indians, being citizens of the United States, are citizens of the State of Oregon, and subject to all its laws, as well as the United States statutes governing them upon reservations: 24 Stats. at Large, 390, § 6; *Wa-la-note-tke-tynin* v. *Carter,* 6 Idaho, 85 (53 Pac. 106); *State ex rel.* v. *Norris,* 37 Neb. 299 (55 N. W. 1087, 1089); *State ex rel.* v. *Denoyer,* 6 N. D. 586 (72 N. W. 1014); *Carter* v. *Wann,* 6 Idaho, 556 (57 Pac. 314); *United States* v. *Hadley,* 99 Fed. 437; *United States* v. *Kopp,* 110 Fed. 165; *In re Celestine,* 114 Fed. 551; *State* v. *Williams,* 13 Wash. 335 (43 Pac. 15).

There is no common-law marriage in Oregon. Marriages must be solemnized as provided by statute: *Holmes* v. *Holmes,* 12 Fed. Cas. 412; *Offield* v. *Davis,* 100 Va. 250 (40 S. E. 910).

MR. CHIEF JUSTICE MOORE, after stating the facts in the preceding terms, delivered the opinion of the court.

1. It is contended by plaintiff's counsel that notwithstanding land in the Umatilla Indian Reservation had been

allotted in severalty to Joe Kalyton, and also to plaintiff's mother, their tribal relations still existed, and, as the testimony shows that they were married according to the customs and laws of the tribe to which they belonged, the court erred in refusing to grant the relief prayed for. It is maintained by the defendants' counsel, however, that the testimony shows that plaintiff's mother was incompetent to enter into a legal marriage, and, this being so, the plaintiff was not born in lawful wedlock, and hence no error was committed as alleged. The Cayuse Indians were recognized as a tribe by the United States June 9, 1855, when a treaty was concluded with them and other Indians, which was ratified by the Senate March 8, 1859, and approved by the President April 11th of that year, setting apart for their exclusive use certain territory in Oregon, which has since been known as the "Umatilla Indian Reservation": 12 Stat. U. S. 945. An act of Congress approved March 3, 1885, authorized the President of the United States, with the consent of the Indians, to allot to the Cayuse and other Indians residing upon the Umatilla Reservation certain areas of land in severalty, and, in addition thereto, to reserve a reasonable amount of pasture and timber lands for their use in common, and also a tract for an industrial farm and school, not exceeding, in all, 120,-000 acres. A commission was created to survey the land and make allotment thereof, which, if approved by the Secretary of the Interior, should thereafter constitute the reservation for the Cayuse and other Indians, and within which the allotments were required to be made. The President was also authorized to cause patents to be issued to all allottees, declaring that the United States held the land so allotted for the term of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment was made, or, in case of his death, of his heirs, according to the laws of the State of Oregon, and that at

the expiration of that period the United States would convey the premises by patent to the allottee or his heirs in fee, discharged of the trust, and free of all charge or incumbrance whatsoever. The law of alienation and descent in force in this State was made applicable thereto after the issuance of the patents, except as therein otherwise provided: 23 Stat. U. S. 340, c. 319, § 1.

Section 6 of an act of Congress approved February 8, 1887, generally known as the "Dawes Act," providing for the allotment of land in severalty to the Indians on the various reservations, is as follows: "That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and no territory shall pass ·or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. · And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property": 24 Stat. U. S. 388, 390, c. 119 (3 Fed. Stat. Ann. 496). Section 5 of an act of Congress approved February 28, 1891, amending and extend-

ing the benefits of the act approved February 8, 1887, is, so far as deemed applicable, as follows: "That for the purpose of determining the descent of land to the heirs of any deceased Indian under the provisions of the fifth section of said act, whenever any male and female Indian shall have cohabited together as husband and wife according to the custom and manner of Indian life the issue of such cohabitation shall be, for the purpose aforesaid, taken and deemed to be the legitimate issue of the Indians so living together, and every Indian child, otherwise illegitimate, shall for such purpose be taken and deemed to be the legitimate issue of the father of such child": 26 Stat. U. S. 794, 795, c. 383 (3 Fed. Stat. Ann. 499, 501).

These excerpts and quotations from the acts of Congress disclose the policy pursued by the United States in dealing with Indians residing upon reservations to whom land has been allotted in severalty, and, though these people have been invested with the rights of citizenship and guaranteed the protection of the laws, and rendered amenable thereto, the object evidently intended to be subserved by such legislation was to encourage them to forsake their primitive ways and to adopt a higher civilization. Reforms of this character are necessarily radical, and not cheerfully submitted to or acquiesced in by uneducated Indians. The change from savagery to refinement is slow, and results from convincing the ignorant of the superior advantages which the latter state affords. The general government, realizing that the task of persuading the older Indians was difficult, has established schools to teach their children the English branches, and to instruct them in the use of tools and implements, thus rendering them self-supporting and partially qualified to compete with the Caucasian race. It is to the younger Indians, then, when removed from the influence of the examples of their parents, and from the teachings and

traditions of their tribes, during the formation of their characters, and when educated in the schools provided for them, that the government must look, to elevate their race.   It is quite probable that this conclusion induced the passage of section 5 of the act of Congress approved February 28, 1891 (26 Stat. U. S. 794, 795, c. 383, 3 Fed. Stat. Ann. 499, 501), providing that, for the purpose of determining the descent of land to the heir of any deceased Indian, whenever a male and a female Indian shall have cohabited as husband and wife, according to the custom and manner of Indian life, the issue of such cohabitation shall be deemed their legitimate offspring.   Congress thus recognized the validity of Indian marriages, and, though the union may have occurred subsequent to the acceptance of an allotment of land in severalty in an Indian reservation, we believe that if the nuptials were celebrated according to the custom of the tribe of which the parties were members, or to which one of them belonged, and, in pursuance of such union, they have cohabited as husband and wife, the marriage is valid : *Johnson* v. *Johnson's Admr.* 30 Mo. 72 (77 Am. Dec. 598); *Earl* v. *Godley*, 42 Minn. 361 (44 N. W. 254, 7 L. R. A. 125, 18 Am. St. Rep. 517); *Bank of Austin* v. *Sharpe*, 12 Tex. Civ. App. 223 (33 S. W. 676).

In *United States* v. *Rickert*, 188 U. S. 432 (23 Sup. Ct. 478), Mr Justice HARLAN, in speaking of persons residing on a reservation, to whom allotments of land in severalty had been made thereon, says: "These Indians are yet wards of the nation, in a condition of pupilage or dependency, and have not been discharged from that condition." The allotment of a part of a reservation to Indians in severalty does not terminate their tribal relations, nor remove them from the supervision and control of the interior department of the general government: *United States* v. *Flournoy L. S. & Rl. E. Co.* (C. C.) 71 Fed. 576. To reach any other conclusion might in some instances

thwart the beneficient purposes of the government, and transfer the title of land donated by it to induce the elevation of a race into another channel, never contemplated, for if a marriage entered into by members of a tribe, according to the customs thereof, is to be held invalid, and the issue illigitimate, the offspring could never inherit from the father, whose real property, if he had no collateral kinsmen, following the rule of descent in Oregon, would escheat to the State: Laws 1903, p. 127. In *McBean* v. *McBean*, 37 Or. 195 (61 Pac. 418), Mr. Chief Justice WOLVERTON, in speaking of the tribal relations of an allottee on the Umatilla Indian Reservation, makes use of the following language: "And it is the adjudged policy of the law to treat the Indian tribes who adhere to their peculiar customs as separate communities or distinct nationalities, with full and free authority to manage their own domestic affairs, and to pursue their own peculiar habits and customs, especially as it concerns the marriage relation. And this is so although their territory is located within the state lines, and the Federal Government manages their affairs through agencies designated for the purpose." In *State* v. *Columbia George*, 39 Or. 127 (65 Pac. 604), the same justice, in discussing the rights of the Indians on that reservation, and the paternal exercise of authority over them, further says: "It would seem, therefore, that citizenship, such as extends, within the purview of the Dawes Act, to Indian allottees, is neither inconsistent nor incompatible with the status of a tribal Indian; that the government, while it has bestowed citizenship, has not thereby relinquished the guardianship of the tribes — indulging them yet a little while, but with greatly restricted authority, in their primitive government." Though Indians residing on a reservation, to whom land therein has been allotted in severalty, are classed as citizens, and deemed to be subject to the laws of the state,

the Federal courts only have jurisdiction of grave crimes committed on the reservation by one such Indian against another: *State* v. *Columbia George*, 39 Or. 127 (65 Pac. 604). This is an admission that notwithstanding the allotment a *quasi* tribal relation still subsists, and that the general government still continues to exercise a paternal care over these wards of the nation, and until that guardianship is removed, the state courts should not interfere with or disturb the domestic relations of such Indians; but, when these relations are involved, it should be the duty of the state courts to determine whether or not they had been entered into or dissolved in accordance with the customs of the tribe.

2. The principal inquiry, therefore, is whether Joe Kalyton and plaintiff's mother were married according to the customs of the Cayuse Indians. Lee Moorehouse, who had been Indian agent at the Umatilla Reservation, appearing as plaintiff's witness, testified that he had observed the customs of the Indians on that reservation, and was asked: " Can you tell the habits of these Indians in regard to marrying, by the Indian custom?" and, over objection and exception, replied: "There doesn't appear to be any regular form they go through in an Indian marriage, and, to get married, they simply go to living together, as near as I understand it." This witness further says that when these Indians concluded to marry they entered into the agreement by mutual consent, and went to living together; that sometimes the man, if he had any property, purchased his wife; and that he understood the Indians considered their form of marriage as sacred as any other. In *Henry* v. *Taylor* (16 S. Dak. 494, 93 N. W. 641), it was held that in order to show a marriage between two Indians according to the Indian custom, consisting of an agreement to live together, followed by cohabitation, it was necessary to show an express agreement and pursuant cohabitation,

which contract must be evidenced by words disclosing a meeting of minds, uttered in the present tense, for the purpose of establishing the marriage relation. The plaintiff's mother, testifying by an interpreter, says that she lived with Joe Kalyton as his wife five years immediately prior to his death; that they were not married by any regular custom; that he asked her if she would live with him, and she consented; that the young and the old· Indians are married in that manner; and that it is an old custom, and she could not tell when it commenced. The testimony of this witness is corroborated by that of Joe Allen, who says that Kalyton and plaintiff's mother lived together as other Indian husbands and wives belonging to that tribe. The defendant Mary Kalyton testifies that her brother and plaintiff's mother lived together as husband and wife according to the Indian customs, in speaking of which she says she was first married in that manner, and lived with her husband one summer, and that they were thereafter married according to the laws of this State. We think the testimony clearly shows a valid and subsisting custom of the Cayuse tribe of Indians, in observing which Kalyton and plaintiff's mother entered into an express agreement, evidenced by words disclosing a meeting of their minds, followed by cohabitation, and, under the rule announced, established the existence of a valid marriage.

It is maintained by defendants' counsel, however, that plaintiff's mother was not competent to enter into a marriage contract at the time or after she commenced living with Kalyton, and, this being so, plaintiff's illegitimacy is established, and no error was committed in decreeing the real property of which he died seised to his sister, as his sole heir. The testimony shows that plaintiff's mother had lived with the following named Indians, as the wife of each, respectively, to wit: Ish-lo-wal-ko, White Wolf,

and Top-la-won. The transcript does not show whether or not the first-named person is dead, but it discloses that the others were living during all the time she lived with Kalyton, Top-la-won having remarried. The plaintiff's mother testifies that she was married to these persons in the Indian manner, and that she ceased to live with and separated from each according to the custom of her tribe. The following question was propounded to the interpreter: "Ask her if she separated or was divorced from White Wolf and these other Indians according to Indian custom, the same as Indians always separated?" and she answered, through him, as follows: "Yes, sir; separated in the Indian way." No evidence was offered tending to show how an Indian divorce is secured, and it is argued by defendants' counsel that the testimony of plaintiff's mother is the mere statement of a legal conclusion, and insufficient to establish the probative facts of the dissolution of the marital relation according to the Indian custom. The legal principle insisted upon would ordinarily be sufficient to defeat the plaintiff's right of recovery, but in the present instance we do not think the rule invoked applicable, for, in settling the pleadings, the court having held that after the allotment of land in severalty a marriage according to law was a prerequisite to the legitimacy of the issue of cohabitation, the subordinate question of the capacity of plaintiff's mother to enter into a marriage contract with Kalyton was not given that degree of attention which its importance demanded. No objection was interposed to the questions propounded to her in relation to her separation from her prior husbands, nor was she cross-examined as to the customs of her tribe in the manner of securing divorces, in view of which we believe the testimony was sufficient to show that she was divorced from them, and was capable of entering into a valid marriage with Kalyton.

It is contended by defendants' counsel that the plaintiff was not born within the period of gestation after the death of Kalyton, and hence no error was committed in rendering the decree complained of. The testimony shows that Kalyton died, as plaintiff's mother testified, a "few days" after the new year, and that her daughter was born "late in the fall — the time the leaves fall off the trees"; that the witness did not know the names of the months, but that plaintiff was born about one month before Christmas, and at the trial her age was "four snows." When it is considered that the knowledge of plaintiff's mother concerning the year seems to be limited to the holidays, and that a "few days" or "one month" are to her vague and indefinite terms, we believe her testimony that Kalyton was the father of her daughter to be true, without discussing the question of how long gestation might be protracted. No testimony having been offered tending to show that plaintiff's mother was dissolute, we conclude that her daughter, the plaintiff herein, was born in lawful wedlock, and is the sole heir of Joe Kalyton, deceased, and, as such, entitled to the possession of the real property of which he died seised. The decree will therefore be reversed, and one entered here in accordance with this opinion.

REVERSED.

Decided 17 October, 1904.

ON MOTION FOR REHEARING.

MR. CHIEF JUSTICE MOORE delivered the opinion.

3. A petition for a rehearing having been filed, it is contended that this suit was instituted to determine, in effect, the title and right to the possession of public land, thereby necessarily rendering the United States a party; but that this cannot be done by a state court, and hence the decree rendered herein is *coram non judice* and void.

○

The legal principle now insisted upon was not discussed by counsel at the trial in this court, but, as jurisdiction of subject-matter cannot be conferred by consent, is never waived (B. & C. Comp. § 72), and may be invoked for the first time on appeal (*Evarts* v. *Steger*, 5 Or. 147), it becomes necessary to consider the question presented. ·

4. The act of Congress approved March 3, 1885 (23 Stat. U. S. 340, c. 319, § 1), providing for the allotment of lands in severalty to the Indians residing upon the Umatilla Reservation, in this State, and prescribing the quantity to be distributed to each person of the various classes, contains the following clause : "The President shall cause patents to issue to all persons to whom allotments of lands shall be made under the provisions of this act, which shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State of Oregon, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever; *provided*, that the law of alienation and descent in force in the State of Oregon shall apply thereto after patents have been executed, except as herein otherwise provided." An examination of the language quoted will show that, though the issuance of two patents is contemplated, it is evident that the first specified in the act was intended to be nothing more than a certificate or written memorandum to evidence the selection of the land allotted and to declare the trust reserved : *United States* v. *Rickert*, 188 U. S. 432 (23 Sup. Ct. 478).

5. In our opinion, the word "descent" in the clause stipulating "that the law of alienation and descent in force

in the State of Oregon shall apply thereto after patents
have been executed," etc., was intended to render the
transmission of an estate by inheritance applicable to the
land allotted to an Indian from the time such certificate
was issued. The word "alienation" usually means the act
by which the title to real property is voluntarily trans-
ferred by one person to and accepted by another, and such
act is generally accomplished by the execution of a deed
or of a will: *Burbank* v. *Rockingham, etc. Ins. Co.* 24
N. H. 550 (57 Am. Dec. 300). As an Indian cannot vol-
untarily transfer the title to the land allotted to him until
the final patent is issued, it is evident that the word "alien-
ation" was not used in the act under consideration in its
technical sense.

6. It is quite probable, however, that until the title is
transferred an Indian allottee has no estate in the prem-
ises, and that his heirs take as donees of the United States,
and not by inheritance from him. The act having pro-
vided that after the expiration of twenty-five years from the
time of the allotment "the United States will convey the
premises by patent" to the allottee or his heirs "in fee,"
etc., the final patent, when issued, will invest the allottee
with an estate in the land that he can "alienate" or "de-
vise," and, as these quoted words were not necessary in the
grant of a fee, they, in our opinion, are limited to the first
patent issued.

7. The law of descent of this State being applicable on
the death of an Indian allottee after the primary patent or
certificate is issued, has a state court jurisdiction of the
subject-matter, and is its decree determining the heirs in
such cases valid? So long as the United States holds the
lands in trust for Indian allottees, the title thereto remains
in the general government (*United States* v. *Rickert*, 188
U. S. 432, 23 Sup. Ct. 478), and the question as to whether

45 OR.——9

or not a final patent therefor shall issue is to be determined by the Secretary of the Interior, thereby depriving state courts of all jurisdiction of the subject-matter : *Mosgrove* v. *Harper*, 33 Or. 252 (54 Pac. 187); *Moore* v. *Robbins*, 96 U. S. 530 ; *United States* v. *Schurz*, 102 U. S. 378. If this were a suit to enforce the trust reserved, the United States would be an indispensable party (Act Cong. Feb. 6, 1901, 31 Stat. U. S. 760, c. 217; 3 Fed. Stat. Ann. 503, 504, §§ 1, 2); Pomeroy, Remedies, § 356; *Tucker* v. *Silver*, 9 Iowa, 261; *Hy-yu-tse-mil-kin* v. *Smith*, 194 U. S. 401, 24 Sup. Ct. 676), and as this cannot be done by a state court the decree rendered herein would be void. The determination by a state court of the heirs of a deceased Indian allottee is not, in our opinion, an execution of the trust: *Bird* v. *Wimyer*, 24 Wash. 269 (64 Pac. 178); *Bird* v. *Terry* (C. C.) 129 Fed. 472. The finding of such fact is not an interference with the primary disposal of the soil, but is in aid of the general government in protecting the rights of its *cestui que trust*. Thus in *Kitcherside* v. *Myers*, 10 Or. 21, it was held that where a person had taken the initiatory steps to secure the title to public land, and received from the proper officers the necessary evidence thereof, he was entitled to the possession of the premises selected, and for any interference therewith by another without legal title or equal equitable claim a state court, upon application of the entryman, would put him in possession of his rights. The rule is settled in this State that a person entitled to the possession of land the title to which is in the United States will be protected in his right by our courts, when his possession has been unlawfully disturbed by another : *Jackson* v. *Jackson*, 17 Or. 110 (19 Pac. 847); *Hindman* v. *Rizor*, 21 Or. 112 (27 Pac. 13); *Allen* v. *Dunlap*, 24 Or. 229 (33 Pac. 675); *Bishop* v. *Baisley*, 28 Or. 119 (41 Pac. 936); *Pacific Live Stock Co.* v. *Gentry*, 38 Or. 275 (61 Pac. 422, 65 Pac. 597); *Browning* v. *Lewis*, 39

Or. 11 (64 Pac. 304); *Moore* v. *Halliday*, 43 Or. 243 (72 Pac. 801, 99 Am. St. Rep. 724, and note). In the case at bar Joe Kalyton was entitled, during his lifetime, to the possession of the land allotted to him, and upon his death his heirs, under the law of descent in this State, succeeded to his right in the premises. This possession having been disturbed by one who is not his successor in interest or estate, according to such law, the rule established in this State makes it encumbent upon our courts, in aid of the beneficent policy adopted and pursued by the general government in caring for the Indians and in trying to promote their civilization, to declare by solemn degree who is his legal heir.

It is argued, however, that, unless the Indian agent in charge of the Umatilla Reservation voluntarily surrenders to the plaintiff the possession of the premises allotted to the deceased, it will be impossible to enforce the decree herein. It is the duty of the court to declare the law involved in causes submitted, irrespective of the consequences that may result therefrom, and, having faithfully discharged that obligation according to law, as we understand it, we are compelled to adhere to the opinion heretofore announced, leaving the enforcement of the decree to the person in whose favor it was rendered. It follows that the petition should be denied, and it is so ordered.

REHEARING DENIED.