### YAKIMA JOE v. TO-IS-LAP et al.

(Circuit Court, D. Oregon. June 13, 1910.)

No. 2,923.

MARRIAGE (§ 3*)—INDIANS—LAW GOVERNING—EFFECT OF ALLOTMENT OF LAND IN SEVERALTY.

　　The allotment of lands in severalty to Indians residing on the Umatilla reservation in Oregon, under Act March 3, 1885, c. 319, 23 Stat. 340, did not terminate their tribal relations, and so long as the same continue the marriage relations of such Indians are to be determined by their tribal customs, and not by the laws of the state, and their marriage or divorce in accordance with such customs is valid everywhere and for all purposes.

　　[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 6; Dec. Dig. § 3.*]

Suit by Yakima Joe against To-is-lap, Sa-a-sha-wa-ne, and the United States. Decree for defendants.

S. A. Lowell and Thos. G. Hailey, for plaintiff.
John McCourt, U. S. Atty.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

BEAN, District Judge. This is a suit to determine the rights of the respective parties to 160 acres of land on the Umatilla Indian reservation, allotted in 1893 to an Indian woman, Ke-kas-pe-lu, under Act Cong. March 3, 1885, c. 319, 23 Stat. 340, providing for the allotment of land in severalty to Indians residing upon such reservation. Ke-kas-pe-lu died subsequent to the allotment, leaving surviving her the defendants, her parents, and the plaintiff, who claims to have been her husband. The plaintiff is a Warm Spring Indian, who resided on the Umatilla reservation at the time of the allotment. He claims to have been married according to the Indian custom to the allottee about a year before the allotment, and that they continued to live together as husband and wife until about a year thereafter, when they separated by mutual consent, because the allottee became intimate with another Indian. The plaintiff subsequently married. The evidence as to the relations between the plaintiff and Ke-kas-pe-lu, the allottee, is vague and indefinite, both as to the time and character of such relations. But, assuming that they were married according to the Indian custom before the allotment, it is equally clear that thereafter they separated and were divorced in accordance with the tribal custom among the Indians residing upon the reservation.

As a general rule, it is the policy of the law to treat Indians who retain their tribal relations and adhere to their peculiar customs as separate and independent communities, with full and free authority to regulate and manage their own domestic affairs, especially as it concerns the marriage relation, and therefore a marriage or divorce of tribal Indians, according to Indian customs is regarded as valid everywhere. McBean v. McBean, 37 Or. 195, 61 Pac. 418. But it is contended in this case that since, by the general allotment act of February 8, 1887, known as the "Dawes Act" (24 Stat. 388, c. 119), every Indian to whom allotments shall be made "under any law or treaty" is declared to be a citizen of the United States, and entitled to all the rights, privileges, and immunities of such, the marriage or divorce of Indian allottees under the act of March 3, 1885, must be governed and controlled by the laws of the state in which they reside, and not by their tribal customs. This question was before the Supreme Court of the state (Kalyton v. Kalyton, 45 Or. 116, 74 Pac. 491, 78 Pac. 332), and it was there held, in a carefully prepared opinion by Mr. Chief Justice Moore, that, notwithstanding the allotment of lands in severalty to Indians residing on the Umatilla reservation under the act of 1885, their marriage relations were to be determined by their tribal customs, and not by the laws of the state, so long as their tribal relations continue. In this view I fully concur. It is true the case was subsequently reversed by the Supreme Court of the United States for want of jurisdiction over the subject-matter, but this does not militate against the soundness of the reasoning upon the point now under consideration.

The allotment of land in severalty did not change the limits of the reservation, nor deprive the government of exclusive jurisdiction over crimes committed by one Indian against another on such reservation, nor the right to prohibit the introduction of intoxicating liquors there-

on. State v. Columbia George, 39 Or. 127, 65 Pac. 604; U. S. v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195; U. S. v. Sutton, 215 U. S. 291, 30 Sup. Ct. 116, 54 L. Ed. 200. Nor did it terminate the tribal relations, nor take the Indians from under the supervision and control of the proper governmental department. U. S. v. Flournoy Live Stock & Real Estate Co. (C. C.) 71 Fed. 576. So long as the Indians are permitted to preserve their tribal relations, they are to be regarded as having a semi-independent position, with the power of regulating their internal and social relations, and thus far not brought under the laws of the state. U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228.

I admit that I have no clear conception of the effect of the act of Congress declaring Indian allottees, who are permitted to retain their tribal relations, to be citizens of the United States, nor am I able to find any adjudicated case which throws much light upon the question. But, in any event, they do not cease to be tribal Indians by the mere act of allotment of lands to them in severalty, within the limits of their reservation; nor do I think they are, by that act alone, deprived of the right to regulate their domestic affairs, and especially the marriage relation. The case of Moore v. Nah-con-be, 72 Kan. 169, 83 Pac. 400, in which the Supreme Court of Kansas holds that a marriage or divorce between Indians after the allotment of land to them in severalty must be in compliance with the laws of the state, proceeded on the theory that by the allotment the tribal relations of the Indians were severed, a condition which does not exist on the Umatilla reservation.

Decree accordingly.