*In re* Now-ge-zhuck.

---

*In re* NOW-GE-ZHUCK, *alias* TOMMY WALK-KAS.
**No. 13,858.** ( 76 Pac. 877.)

SYLLABUS BY THE COURT.

**J**URISDICTION—*Power of State Courts to Punish Indian Allottees for Violations of State Laws.* The act of congress of February 8, 1887 (24 U. S. Stat. at L., ch. 119), providing for the allotment of lands constituting a reservation to the Indians in severalty and the issuing of patents to the allottees therefor, and further providing that, upon the completion of said allotments and the issuing of patents to each of the allottees constituting the tribe, each allottee should have the benefit of, and be subject to, the laws, both civil and criminal, of the state in which he might reside, confers jurisdiction on the state courts to try and punish an allottee for any violation of the laws of the state, though the offense committed be one against the person or property of an Indian or other person within the limits of an Indian reservation.

Original proceeding in *habeas corpus*. Opinion filed May 7, 1904. Petitioner remanded.

*In re* Now-ge-zhuck.

*Crane & Woodburn Bros.*, for petitioner.

*W. F. Means*, for respondent.

The opinion of the court was delivered by

ATKINSON, J.: On December 12, 1903, Now-ge-zhuck, *alias* Tommy Walk-kas, a Pottawatomie Indian, filed in this court his petition in *habeas corpus* averring that he was unlawfully restrained of his liberty by the sheriff of Brown county, Kansas, and asking that he be discharged. The case is before us for determination upon the following agreed facts :

"It is agreed by and between the parties to this action that Now-ge-zhuck, *alias* Tommy Walk-kas, was born a member of the Prairie band of Pottawatomie Indians, of Jackson county, Kansas, and is still a member of said tribe of Indians, if their tribal relations were not dissolved by the allotment of lands, in severalty, to the members of said tribe under the act of congress, February 8, 1887. The said band of Indians have made their home on the diminished Pottawatomie Indian reservation, in Jackson county, Kansas, for more than forty years ; and Now-ge-zhuck, *alias* Tommy Walk-kas, has resided thereon during all his life, and resided thereon when arrested in Brown county, Kansas. About the year 1893, the Indians who composed the Prairie band of Pottawatomie Indians were alloted land in severalty, under the aforesaid act of congress, on the diminished Pottawatomie reservation, in said county and state, and each, including Now-ge-zhuck, *alias* Tommy Walk-kas, received his preliminary patent therefor, as provided by said act. The Prairie band of Pottawatomie Indians are, and have been for many years, under the charge of an agent, or a bonded superintendent, appointed by the secretary of the interior of the United States. These Indians still receive their annuities from the United States government. They also have a chief and council. About the — day of November, 1903, Now-ge-zhuck, *alias* Tommy Walk-kas, was attending

the Indian payment of annuities on the Kickapoo Indian reservation, in Brown county, Kansas. The Kickapoo Indians are a tribe of Indians who are located upon the Kickapoo Indian reservation, in Brown county, Kansas. They have resided on said reservation for more than forty years. They have a chief and council, and are, and have been for many years, under the charge of an agent, or a bonded superintendent, appointed by the secretary of the interior of the United States, and still receive their annuities from the United States government. About the year 1893, the Indians who composed the Kickapoo tribe of Indians were allotted land in severalty, under the aforesaid act of congress, on the Kickapoo Indian reservation, in Brown county, Kansas, and preliminay patents were issued therefor. On the — day of November, 1903, Now-ge-zhuck, *alias* Tommy Walk-kas, while attending said payment, was arrested by the sheriff of Brown county, Kansas, on a warrant issued by the justice of the peace of Brown county, Kansas, on a complaint charging Now-ge-zhuck, *alias* Tommy Walk-kas, on the — day of November, 1903, with disturbing the peace and quiet of persons on said reservation in Brown county, Kansas, to which complaint he entered a plea of guilty of such offense and was adjudged to pay a fine of thirty (30) dollars and the costs of said action, and to be confined to said jail for a period of ninety days, and to be committed to said jail until said fine and said costs be paid. From such imprisonment Now-ge-zhuck, *alias* Tommy Walk-kas, asks to be released.''

It is urged that the state court, under the facts stated, had no jurisdiction to try or punish the petitioner, an Indian, for the offense committed. In determining the jurisdiction of the state court, that the question may be considered free from collateral issues the fact that petitioner entered a plea of guilty and the further fact that the offense was committed on the Kickapoo reservation will be treated as though the offense had been committed on the Pottawatomie

reservation and petitioner had been tried and convicted.

The act of congress of May 30, 1854 (10 U. S. Stat. at L., ch. 59), organizing the territory of Kansas, and also the act of January 29, 1861 (12 U. S. Stat. at L., ch. 20), admitting Kansas as a state of the union, each in express terms provided that nothing therein should be construed to impair the rights of persons or property then pertaining to the Indians in the territory included in Kansas, so long as the rights of the Indians should remain unextinguished by treaty with the United States, and that all lands in Kansas belonging to the Indians by treaty with the United States were excepted from, and constituted no part of, the territory of the state of Kansas, unless by treaty or authority of the United States jurisdiction should be extended to the state. From the reservations in these acts of congress it is manifest that the state could have no jurisdiction over the person or property of the Indian while upon the lands reserved, or of the lands so reserved, except by the act and authority of the United States. There is, however, no treaty, act of congress or law of the state that precludes the courts of Kansas from taking jurisdiction of the person and property of the Indians found within the territorial boundaries of the state, except while such Indians or property are actually situated on a reservation excluded from the jurisdiction of the state. (*Rubideaux v. Vallie*, 12 Kan. 28.)

The United States, prior to the act of congress of March 3, 1885 (23 U. S. Stat. at L., ch. 341), in matters jurisdictional of the person and property of the Indians, determined its relation to the tribes by treaty rights. This act was a departure from the treaty method of dealing with them in that particular, and

was declaratory of the right of the United States to assume jurisdiction, and also of the right to adopt the laws, and confer jurisdiction upon the courts, of a territory of the United states as to certain crimes when committed by an Indian against the person or property of an Indian or other person upon a reservation. Section 9 of the act specifies the crimes over which this jurisdiction should extend, as murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny. The right of punishment for these crimes committed by an Indian against the person or property of another Indian or other person, without or within an Indian reservation and within the boundaries of a territory of the United States, was extended to the courts of the territory. The laws of the territory relating to the crimes specified were adopted as the laws by which to govern and control the Indian, and to punish him for the commission of any of the crimes mentioned. Section 9 of the act further provides that an Indian charged with any of the crimes specified, when committed within the limits of an Indian reservation situated within the boundary of a state, shall be tried in courts of the United States and be punished by the laws of the United States.

It will be noted that, while by this act, as to crimes specified, jurisdiction was extended to the territories in which the reservation was situated and the laws of the territory adopted for the government and punishment of the offending Indians, no such rights were extended to the states or to the state courts. The effect of the act of March 3, 1885, was confined to acts of a criminal character, committed by an Indian, a member of some tribe, and committed within the limits of a reservation. It did not interfere with the process of the state courts within the reservation, nor with the

operation of the state laws upon the white people found therein. ( *United States v. Kagama*, 118 U. S.; 375, 6 Sup. Ct. 1109, 30 L. Ed. 228.)

Our attention has not been directed to, and we have been unable to find, any treaty with the Indian tribes whereby the government acquired or asserted jurisdiction of offenses inferior to those specifically mentioned in the act of March 3, 1885. We assume that it was left with the tribes to govern and to punish the offending Indian for all inferior offenses committed on the reservation by an Indian against the person or property of another Indian or other person, until by treaty or by act of congress the United States should assume this jurisdiction or delegate it to the states or territories in which the reservation was situated.

The act of congress of February 8, 1887 (24 U. S. Stat. at L., ch. 119), provided for the allotment of lands comprising Indian reservations to the Indians in severalty, and also for extending the protection of laws, civil and criminal, over the person and property of Indians. That part of the act necessary to be considered in passing on the question before us reads :

"Sec. 5. That upon the approval of the allotments provided for in this act by the secretary of the interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the state or territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or encumbrance whatsoever ; provided, that the president of the United

States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void ; provided, that the law of descent and partition in force in the state or territory where such lands are situated shall apply thereto after patents therefor have been executed and delivered except as herein otherwise provided ; and the laws of the state of Kansas regulating the descent and partition of real estate shall, so far as practicable, apply to all lands in the Indian Territory which may be allotted in severalty under the provisions of this act. . . .

"Sec. 6. That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside ; and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. . . ."

It is apparent that by section 6 it was the intention of congress to extend to the Indian, give him the benefit of, and make him subject to, the laws, both civil and criminal, of the state or territory in which he might reside upon the completion of the allotments and the patenting of the lands to the allottees. The only reservation of federal jurisdiction in the act of February 8, 1887, is the withholding from the Indian the absolute title of the allotted lands for a period of twenty-five years, or longer if the president of the United States, in the exercise of his discretion, extend the period. It is claimed by the petitioner that the act contemplates that even though the allotments have been completed, until the title has become ab-

solute in the allottee, he is not amenable to the laws. of the state.    Upon the solution of this question, applied to the agreed facts, rests the decision of this case.

The exact question before us appears not to have been considered by the supreme court of the United States.    In *United States v. Rickert,* 188 U. S. 432, 436, 23 Sup. Ct. 478, 47 L. Ed. 532, a case denying to the state of South Dakota the right to tax the lands of an Indian after allotment under the act of February 8, 1887, Mr. Justice Harlan, in delivering the opinion of the court, said :

"The word 'patents,' where it is first used in this section, was not happily chosen to express the thought which, it is clear, all parts of the section being considered, congress intended to express.    The 'patents' here referred to (although that word has various meanings) were, as the statute plainly imports, nothing more than instruments or memoranda in writing, designed to show that for a period of twenty-five years the United States would hold the land allotted in trust for the sole use and benefit of the allottee, or, in case of his death, of his heirs, and subsequently, at the expiration of that period, unless the time was extended by the president, convey the fee, discharged of the trust and free of all charge or encumbrance. In other words, the United States retained the legal title, giving the Indian allottee a paper or writing, improperly called a patent, showing that at a particular time in the future, unless it was extended by the president, he would be entitled to a regular patent conveying the fee.    This intepetation of the statute is in harmony with the explicit declaration that any. conveyance of the land or any contract touching the same while the United States · held the title in trust should be absolutely null and void.    So that the United States retained its hold on the land allotted for the period of twenty-five years after the allotment,

and as much longer as the president, in his discretion, should determine.''

The language used and the reasoning employed in that case to show why the lands of the Indians should not be the subject of taxation during the period the same are held in trust by the United States was the basis of the decision in *State v. Columbia George*, 39 Ore. 127, 65 Pac. 604, in which the supreme court of Oregon held that the courts of that state had no jurisdiction to try an Indian allottee for the murder of another Indian, committed on the Umatilla reservation in that state. Petitioner cites these two cases in support of his contention that the courts of this state are without jurisdiction to try him for the offense charged. He also cites the case of *State v. Campbell*, 53 Minn. 354, 55 N..W. 553, 21 L. R. A. 169, which, although a late decision, is not based on the act of February 8, 1887, and the completion of allotments, but upon the act of March 3, 1885, and the fact that the tribal relations had been preserved and the offense committed within the limits of an Indian reservation.

In *Farrell v. United States*, 110 Fed. 942, 49 C. C. A. 183, the circuit court of appeals, in an action involving the question of the authority of the United States to prohibit the sale of intoxicating liquors to any Indian to whom an allotment of land had been made under the act of February 8, 1887, recognized the act as conferring the full right of citizenship upon the Indian under the laws of the state or territory in which he may reside after complete allotment, though the title to the land be held in trust for the Indian by the United States, and though the tribal relation continue. In *State v. Denoyer*, 6 N. Dak. 586, 72 N. W. 1014, an action by Indian allottees, to whom preliminary patents had been issued under the act of February 8,

1887, to require the board of county commissioners to establish voting precincts in the territory from which allotments had been completed, the Indians were held to be citizens of the United States and qualified electors of the state, and voting precincts were required to be established, notwithstanding the United States held the title to the land and it was not taxable under the laws of the state.   The act of congress of February 28, 1891 (26 U. S. Stat. at L., ch. 383) expressly provides for the leasing by the Indians of the lands allotted to them, with the approval of the secretary of the interior, and the act of May 27, 1902 (32 U. S. Stat. at L., ch. 888) likewise authorizes a sale of the interests of adult heirs who have inherited the interest of their ancestors under the laws of the state, such sale to pass good title to the purchaser.   The authorities and acts cited upon the proposition all go to support the view that it was not contemplated that the act of February 8, 1887, should be inoperative until the title of the lands allotted should have become absolute in the allottee.

The withholding of absolute title from the allottee and the holding of it in trust for him by the United States were undoubtedly provided to preserve the land to the Indian as a permanent home, prevent its being taxed by the state and sold upon default in the payment of such taxes, and to protect it against the business acumen and avarice of the white man.   There appears no good reason why the act should be otherwise inoperative during the period in which the title to the lands is held in trust for the allottee by the government.   The language used in section 6 of the act of February 8, 1887, that the "Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the

state or territory in which they may reside," carries with it the irresistible conclusion that it was the intention of congress to give to the Indian the *benefit* of the laws of the state, and to confer upon the state jurisdiction over the Indian allottee, immediately upon the completion of the allotments.

Congress, by authorizing the leasing and the sale of lands by the allottees with the approval of the secretary of the interior, encouraged white men to go among the Indians and upon their lands, not with the view of benefiting themselves, but with the view of giving to the Indians better environments and developing their lands. We are not to presume that congress would encourage the white man to go with his family among and upon the lands of the Indians for the benefit of the latter and not protect him, his family, and his property, from the depredations and lawlessness of the Indians, unrestrained other than by the laws of the tribe to which they belong.

It has been the policy of the United States not only to protect the Indians and preserve this once powerful race from extinction, but to confer upon them the benefits of civilization. From the savage state in which they existed, much progress toward civilization has already been made. Congress by the act of February 8, 1887, in allotting to the Indians in severalty the lands constituting the reservation, advanced another step toward civilization, giving them thereby ownership in a specific tract of land as a home for each allottee and family, freed from the claim of ownership by other members of the tribe. Even if allotment of the lands in severalty failed to dissolve the tribal relations, it at least constituted a step in that direction. The allotment also constituted the allottee a citizen of the state or territory in which he

may reside.  It is not to be presumed that the rights of citizenship would be conferred upon the allottee for his benefit, and he be exempted for a period of twenty-five years from the operation of the laws of the state of which he should become a citizen, and that he would be restrained, except from the commission of those crimes specifically mentioned in the act of March 3, 1885, only by a code of laws based upon the primitive ideas and standards of a tribal council.  An Indian upon whom has been conferred citizenship, and who enjoys the protection of the laws of the state, should be punished for a transgression of them, and this we are to presume that congress contemplated.

It being shown by the agreed facts that the petitioner was an allottee to whom a patent had been issued, and further shown that the allotments had been made and completed as provided by the act of February 8, 1887, the laws of the state were operative, and the state had jurisdiction to arrest and punish the petitioner for the offense by him committed.  The petitioner will be remanded.

All the Justices concurring.