(April 22, 1912.)

## STATE, Respondent, v. NATHAN LOTT and HARRISON JABETH, Appellants.

[123 Pac. 491.]

JURISDICTION OF STATE COURT—STATE JURISDICTION OVER NEZ PERCE INDIANS—CONSTRUCTION OF DAWES ACT—EVIDENCE—ADMISSION OF CONFESSION BY CODEFENDANT.

(Syllabus by the court.)

1. Under the provisions of sec. 6 of the act of Congress of February 8, 1887, known as the Dawes Act, upon the completion of allotments made under that act, and the patenting of the lands to the allottees by trust patents, each and every member of the respective bands or tribes of Indians to whom allotments are made "shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside," and the state courts accordingly have jurisdiction to try an Indian for any public offense, except the introduction of liquor into the Indian country, where such Indian has taken an allotment under the provisions of the Dawes Act.

2. The Nez Perce Indians took their allotments under and in pursuance of the provisions of the act of Congress of February 8, 1887, known as the Dawes Act, and the Nez Perce Indian Reserva-

tion was ceded to the United States government by treaty and agreement of May 1, 1893 (28 Stats. at Large, 331), and the reservation was opened and allotments were made under that treaty and in pursuance of and in conformity with the provisions of the Dawes Act.

3. Under the provisions of art. 9 of the treaty or agreement of May 1, 1893, made between the agents of the government and the Nez Perce Indian tribe, jurisdiction was reserved to the United States to prosecute violations of the federal statutes in relation to the introduction of intoxicating liquors into the Indian country.

4. The provisions of sec. 9 of the act of Congress of March 3, 1885 (23 Stats. at Large, 385), reserving to the general government exclusive jurisdiction to try all charges against Indians for crimes committed by them against the property or person of another Indian, embraced within the charges of murder, manslaughter, rape, arson, assault with intent to kill, burglary and larceny, do not apply to Indians whose reservation was thrown open and who received allotments under the provisions of the act of Congress of February 8, 1887, known as the Dawes Act, prior to the amendment of that act by the act of Congress of May 8, 1906 (34 Stats. at Large, 182).

5. The act of Congress of May 8, 1906, amending sec. 6 of the act of February 8, 1887, was not retroactive in its effect and did not affect the jurisdiction of the state courts to try Indians who had received their allotments under the Dawes Act and prior to the passage and approval of the amendatory act.

6. Where a written document is admitted purporting to be a confession made by one of the defendants and which was not properly identified, and where the circumstances under which the statement was made are not shown, and where the defendant is an Indian and denies making the statement and claims that he was intoxicated at the time the statement purports to have been made, and the witnesses present at the time of the making of the statement are not sworn or examined, and no one who was present at the making of the statement or who claims to know anything of the circumstances under which it was made, is sworn or testifies, *held,* that the admission of the statement under such circumstances and conditions was erroneous and prejudicial.

APPEAL from the District Court of the Second Judicial District for Idaho County. Hon. Edgar C. Steele, Judge.

Prosecution upon a charge of larceny. From a judgment of conviction defendants appeal. *Reversed.*

Clay McNamee, and James L. Harn, for Appellants.

The citizenship of the Indian on the reservations is in no wise inconsistent with continued federal jurisdiction over commission of offenses enumerated in the act of 1885. (*United States v. Logan,* 105 Fed. 240; *United States v. Mullin,* 71 Fed. 682; *United States v. Rickert,* 188 U. S. 432, 23 Sup. Ct. 478, 47 L. ed. 532; *McKay v. Kalyton,* 204 U. S. 458, 27 Sup. Ct. 346, 51 L. ed. 566; *State v. Columbia George,* 39 Or. 127, 65 Pac. 604.)

Citizenship, such as extends within the purview of the "Dawes" Act to Indian allottees, is neither inconsistent nor incompatible with the status of a tribal Indian. Until the government has taken its hands off, the state court cannot assume jurisdiction touching the criminal acts of one against another. (*State v. Columbia George,* 39 Or. 127, 65 Pac. 604; *United States v. Celestine,* 215 U. S. 278, 30 Sup. Ct. 93, 54 L. ed. 195.)

By virtue of art. 9 of the agreement with the Nez Perce Indians entered into at the Nez Perce agency on May 1, 1893, it was provided that the United States government should have exclusive jurisdiction in prohibiting the introduction of intoxicants on the reservation. And since that time the power of appointing and employing police comprising members of the tribe has been exercised by all of the Indian agents or superintendents on that reservation, thereby showing the attitude of the government toward these wards. (Vol. 1, Indian Affairs, Laws and Treaties, 2d ed., Keppler, p. 540.)

D. C. McDougall, Attorney General, O. M. Van Duyn, and J. H. Peterson, Assistants, for Respondent.

As a matter of constitutional law, an Indian appears to be entitled to the benefit of and to be subject to the laws of the state in which he resides the moment he becomes a citizen of the United States. (*In re Heff,* 197 U. S. 488, 25 Sup. Ct. 506, 49 L. ed. 848; *Bird v. Winyer,* 24 Wash. 269, 64 Pac. 178; *Hankey v. Bowman,* 82 Minn. 328, 84 N. W. 1002.)

The Heff case and the case at bar are cases in which the allottee was expressly, by the statute of February 8, 1887, made subject to the civil and criminal laws of the state.

Indian allottees, immediately upon allotment being made, are subject to the criminal laws of the state, notwithstanding the fact that the crime was committed upon the reservation. (*United States v. Kiya,* 126 Fed. 879.)

By the first sentence of sec. 6 of the act of February 8, 1887, Indian allottees are expressly made liable to the criminal jurisdiction of the state wherein Indian reservations are situated. Indian allottees upon the Nez Perce Indian reservation obtain their allotments under the law of Feb. 8, 1887, and not by a former or other law or treaty, and, therefore, they fall within the provisions of the Heff case. Although by the law of 1885, the United States may have had exclusive jurisdiction of the crime of grand larceny committed by one Indian allottee against another upon an Indian reservation, yet by the later law of 1887, the United States amended and repealed the said law by giving jurisdiction of all such crimes to the state.

AILSHIE, J.—The appellants, Nathan Lott and Harrison Jabeth, are Nez Perce Indians. They were informed against by the prosecuting attorney of Idaho county and charged with the crime of grand larceny. It was charged by the information that on the 13th day of June, 1911, they stole two horses from one Stephen Axtel, who is also a Nez Perce Indian. The defendants moved to quash the information on the ground that the state court had no jurisdiction to try them upon a charge of larceny, and that the jurisdiction of such offense is in the federal court. The motion to quash was accompanied by affidavits showing that the accused were Nez Perce Indians and the person from whom the property was claimed to have been stolen was a Nez Perce Indian, and that the alleged theft was committed upon what formerly constituted the Nez Perce Indian Reservation and upon an Indian allotment therein.

It was admitted by the state and is admitted on this appeal that the accused are Nez Perce Indians, and that the party from whom the property was stolen was a Nez Perce Indian, and that the theft was committed upon an Indian allotment upon what was formerly known and designated as the Nez Perce Indian Reservation, and so the question of federal jurisdiction is squarely raised on this appeal. The defendants moved for an instructed verdict upon the submission of the proofs and also subsequently moved in arrest of judgment on the same ground stated in the motion to quash the information.

The Nez Perce Indians received allotments under and in pursuance of the provisions of the act of Congress of February 8, 1887 (24 Stats. at Large, 389, 3 Fed. Stat. Ann. 494), known as the "Dawes Act." The state claims the right to prosecute a Nez Perce Indian for the commission of a crime against the laws of the state, whether committed against an Indian or a white man, and whether upon an Indian reservation or elsewhere, under and by virtue of sec. 6 of the act of Congress of February 8, 1887, which provides as follows:

"That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and within its jurisdiction to equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up within said limits, his residence separate and apart from any tribe of Indians therein and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States, without in

any manner impairing or otherwise affecting the right of any such Indian to tribal or other property.''

The appellants contend, on the other hand, that under the provisions of sec. 9 of the act of March 3, 1885 (23 Stats. at Large, 385; 3 Fed. Stat. Ann., p. 388), the federal government has reserved to the federal courts exclusive jurisdiction to try all charges against Indians for crimes committed by them against the person or property of another Indian embraced within the charges of murder, manslaughter, rape, assault with intent to kill, arson, burglary and larceny. That section reads as follows:

''That immediately upon and after the date of the passage of this act all Indians, committing against the person or property of another Indian or other person any of the following crimes, namely, murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny within any territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such territory relating to said crimes, and shall be tried therefor in the same courts and in the same manner and shall be subject to the same penalties as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases; and all such Indians committing any of the above crimes against the person or property of another Indian or other person within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States.''

Now there can be no doubt but that under the provisions of the act of March 3, 1885, above quoted, the government reserved the exclusive jurisdiction to try an Indian upon the charge of larceny committed under any of the conditions or circumstances set forth in that act. It is contended here, however, that the Nez Perce Indians having taken their allotments under the provisions of the act of February 8, 1887,

are subject to the provisions of that specific act, and that this latter act amounted to an amendment of the act of March 3, 1885, with reference to this specific tribe of Indians, in so far as the later act provided "That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made *shall have the benefit of and be subject to the laws, both civil and criminal of the state or territory in which they may reside.*"

It seems to us that this question is decisively answered by the decision of the supreme court of the United States in *In re Heff,* 197 U. S. 488, 25 Sup. Ct. 506, 49 L. ed. 848. That case arose over the conviction of Heff for selling liquor to an Indian who was a member of the Kickapoo Indian tribe within the state of Kansas. It appears from the statement and the opinion, both of which were prepared by Mr. Justice Brewer, that the Kickapoo Indians had taken their allotments under the provisions of the act of February 8, 1887, being the same act under which the Nez Perce Indians received their allotments. It was held by the court there "that when the United States grants the privileges of citizenship to an Indian, gives him the benefit of, and requires him to be subject to, the laws, both civil and criminal, of the state, it places him outside of the reach of police regulations on the part of Congress; that the emancipation from federal control thus created cannot be set aside at the instance of the government without the consent of the individual Indian and the state, and that this emancipation from federal control is not affected by the fact that the lands it has granted to the Indian are granted subject to a condition against alienation and encumbrance or the further fact that it guarantees to him an interest in tribal or other property."

In that case it was contended by the solicitor general on behalf of the government that the language of the first sentence of sec. 6 of the act of February 8, 1887, should be construed as referring to the time on and after which final patents conveying fee simple title should be granted by the government rather than to the issuance of trust patents to

the allottees. The court answered that question very fully and denied the contention made by the government. The court said:

"It is urged that this clause becomes operative only when the final patent provided for by section 5 is issued; but there are many reasons why such contention is unsound. In the first place, it is hardly to be supposed that Congress would legislate twenty-five years in advance in respect to the general status of these Indians. If they were to continue in the same relation to the government that they hitherto occupied it would seem as though Congress would have said nothing and waited until near the expiration of twenty-five years before determining what should be such status. Second, the language of the first sentence of section 6 forbids the construction contended for. It is 'that upon the completion of said allotments and the patenting of the lands to said allottees.' Now the allotting and the patenting are joined together as though occurring at or near the same time. Further, when the first patent is issued the recipient ceases to be an allottee, and becomes a patentee. Again, the second patent does not always go to the holder of the first patent, because, as provided by section 5, it may go to the first patentee or his heirs. And finally, the last sentence indicates that the whole section deals with present conditions and present rights. . . . . This confers citizenship upon the allottee, and not upon the patentee, while at the same time securing to him his right to tribal or other property. So far as his political status is concerned, the allottee is declared to be a citizen—not that he will be a citizen after twenty-five years have passed and a second patent shall have been issued.

"This question has been presented to several state and some federal courts, and the ruling universally has been to the same effect. (*State ex rel. Tompton v. Denoyer,* 6 N. D. 586, 72 N. W. 1014; *State ex rel. Crawford v. Norris,* 37 Neb. 299, 55 N. W. 1086; *Wa-La-Note Tke-Tynin v. Carter,* 6 Idaho, 85, 53 Pac. 106; *In re Walk-kas (In re Now-Ge-Zhuck),* 69 Kan. 410, 76 Pac. 877; *United States v. Rickert,*

106 Fed. 5; *Farrell v. United States,* 110 Fed. 942, 947, 49 C. C. A. 183.)''

The decision in the Heff case was rendered in April, 1905. Congress thereafter and on May 8, 1906 (34 Stats. at Large, p. 182), passed an act amending section 6 of the act of February 8, 1887, and this amendment was evidently passed for the purpose of meeting the difficulty pointed out by the decision in the Heff case and of providing that the Indian should only ''be subject to the laws, both civil and criminal, of the state or territory'' in which he may reside ''at the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee as provided in section 5 of this act.'' (34 Stats. at Large, 182; 1909 Supp. Fed. Stat. Ann. 204.) Justice Brewer, however, as will be observed from the language above quoted, had said in the Heff case ''that the emancipation from federal control thus created (by the act of Feb. 8, 1887) cannot be set aside at the instance of the government without the consent of the individual Indian and the state.'' We take this as expressing the view of the court that Congress would have no power to recall the grant made by the act of February 8, 1887, as to any Indians to whom allotments had been made prior to an amendment or repeal of the statute. Congress evidently so regarded the matter when passing the amendment of May 8, 1906, for the reason that they incorporated a special proviso in the act indicating their purpose to have the amendment apply only to Indians to whom allotments should *subsequently be made.* The proviso reads: ''Provided further, that until the issuance of fee simple patents all allottees to whom trust patents shall *hereafter* be issued shall be subject to the exclusive jurisdiction of the United States.''

It was clearly not the intention of Congress that the amendment of May 8, 1906, to sec. 6 of the act of February 8, 1887, should be retroactive in its effect or should affect any allottees under the act of 1887 to whom allotments had been made and trust patents issued prior to the time of the amendment, and we have no hesitancy in holding that the amendment of May 8, 1906, does not apply to Nez Perce

Indians who had received trust patents some ten years prior thereto under the provisions of the Dawes Act.

In *United States v. Celestine,* 215 U. S. 278, 30 Sup. Ct. 93, 54 L. ed. 195, the supreme court was called upon to determine the jurisdiction of the circuit court of the United States for the western district of Washington to try an Indian who was prosecuted for the murder of another Indian within the limits of the Tulalip Indian Reservation. Mr. Justice Brewer, who had written the opinion in the Heff case, also wrote the opinion in the Celestine case, and he therein calls attention to the fact that Congress, after the passage of the act of February 8, 1887, known as the Dawes Act, evidently concluded "that it had been hasty in granting full right of citizenship to Indians," and passed the amendment of May 8, 1906, to rectify the error as to future Indian allottees. In the Celestine case the court held that the federal court had jurisdiction to try Celestine for the murder of an Indian on the Tulalip Reservation, but the holding was made on the ground that the Tulalip Indians had taken their allotments pursuant to the treaty with the Omahas of March 16, 1854 (10 Stats. at Large, 1043), and the treaty of Point Elliott of January 22, 1855 (12 Stats. at Large, 927), and that Indians taking under those treaties were not "subject to the laws, both civil and criminal, of the state or territory in which they may reside," but, on the contrary, were subject to the provisions of the act of March 3, 1885 (23 Stats. at Large, 385), whereby Congress reserved to the federal courts the exclusive jurisdiction to prosecute Indians for certain offenses therein named, including murder and larceny. The court, referring to the decision in the Heff case, said:

"In that, the person to whom the defendant sold liquor (the charge being that of selling liquor to an Indian) had received a patent under the provisions of the act of Congress of February 8, 1887, known as the general allotment act (24 Stats. at Large, 388, chap. 119), whereas the patents in this case were issued under the authority of the treaty with the Omahas, March 16, 1854, *supra,* and the treaty of Point

Elliott, January 22, 1855, *supra.* It also appeared that the sale was made not on any reservation, while here the murder was committed within the limits of one.''

Addressing himself to the construction and application of sec. 6 of the act of February 8, 1887, the learned justice said:

''It will be seen that the first sentence of the latter section which provides that the allottees shall be 'subject to the laws, both civil and criminal, of the state or territory in which they may reside,' applies to allotments and patents made under the authority of that act, whereas the other sentence refers to allotments made under the act of 1887, or under any law or treaty, and in respect to the allottee, it is provided only that he 'is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens.' In other words, so far as the plea is concerned, it is only that Celestine was a citizen of the United States, and entitled to all the rights, privileges and immunities of such citizenship.''

The Celestine case fully settles and establishes the following construction of sec. 6 of the act of February 8, 1887: First, that the first sentence of the section applies to Indian allottees as soon as they receive the trust patents, and that they are immediately thereafter ''subject to the laws, both civil and criminal, of the state or territory in which they may reside''; and second, that by the second sentence the right of citizenship is conferred upon every Indian born within the limits of the United States ''to whom allotment shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence . . . . is entitled to all the rights, privileges and immunities'' of citizens of the United States. The court points out the difference between conferring the right of citizenship upon the Indian and subjecting him, on the other hand, to the laws, both civil and criminal, of the state in which he resides. Our attention has not been called to any act of Congress, aside from

the act of February 8, 1887, which subjects the Indian to the civil and criminal jurisdiction of the state as was done in that act.

Appellant has cited a great array of cases from the federal courts, especially from the supreme court, dealing with the various phases of the jurisdiction and police power of the general government over the Indians of various tribes, but none of these cases deal with the particular question in hand, and especially the Dawes Act, excepting the Heff case, the Celestine case and the case of *Dick v. United States,* 208 U. S. 340, 28 Sup. Ct. 399, 52 L. ed. 520. The latter case, however, was decided upon the provisions of art. 9 of the treaty or agreement of May 1, 1893, between the United States government and the Nez Perce tribe of Indians (28 Stats. at Large, 330), whereby it was stipulated and agreed "that the lands by this agreement ceded, those retained and those allotted to the Nez Perce Indians, shall be subject for a period of twenty-five years to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country. And that the Nez Perce Indian allottees, whether under the care of an Indian agent or not, shall for the like period be subject to all the laws of the United States prohibiting the sale or other disposition of intoxicants to Indians." The argument and reasoning of the Dick case is authority for and sustains the view that the general government has only retained exclusive jurisdiction over the Nez Perce Indians and what formerly constituted the Nez Perce Indian Reservation, to the extent and for the purpose of prohibiting the introduction of intoxicants into the Indian country and to maintain prosecutions for violations of the federal laws in relation thereto. Art. 9 of the treaty of May 1, 1893, which was ratified and approved by act of Congress, August 15, 1894 (38 Stats. at Large, 331), carries on its face a strong inference that the agents of the government and Congress itself considered and understood that the Dawes Act transferred all civil and criminal jurisdiction over Indians taking under that act to the state, and that in order to retain any jurisdiction to the government it should

be specifically reserved and so stipulated in the treaty itself. Under the general rule of construction that the expression of one thing excludes the other, we would naturally infer that the reservation to the United States of the right to prohibit the liquor traffic on the Nez Perce Indian Reservation and to Indian allottees was made with an understanding that jurisdiction in all other matters would rest in the state, and that jurisdiction in this matter would rest in the state but for the specific reservation of that jurisdiction to the general government.

The court held in the Dick case that this agreement having been made between the government and the Indians as a tribe before the tribal title passed to the government and allotments were made to the Indians, that the government was bound to enforce that agreement and that jurisdiction to do so was specifically reserved to the government for such purpose.

Counsel for appellant have placed a great deal of reliance on the case of *State v. Columbia George,* 39 Or. 127, 65 Pac. 604. In that case Columbia George was convicted of the crime of killing and murdering one Anna Edna, an Indian woman, on the Umatilla Indian Reservation. The court held that under the provisions of sec. 9 of the act of March 3, 1885 (23 Stats. at Large, 385, 3 Fed. Stat. Ann. 388), Congress reserved the exclusive jurisdiction in the federal courts to try such charges. It should be noted, however, that the Umatilla Reservation was not allotted under the Dawes Act, but was allotted under the act of March 3, 1885 (23 Stats. at Large, 340). The contention seems to have been made by the state in that case that sec. 6 of the act of February 8, 1887, was retroactive in so far as it provided that ''Indians to whom allotments have been made shall have the benefit and be subject to the laws, both civil and criminal, of the state or territory in which they may reside,'' and upon the general question of the citizenship of the Indian the case was disposed of by the court adversely to the contention of the state. That case, however, does not afford any authority for the position of the appellant in this case.

Counsel also cite the more recent case of *Yakima Joe v. To-Is-Lap*, 191 Fed. 516. This involved the title to 160 acres of land on the Umatilla Indian Reservation that had been allotted under the act of March 3, 1885 (23 Stats. at Large, 340). This case followed the doctrine laid down in the Columbia George case and held that the jurisdiction in such matters was retained in the general government, and pointed out specifically that the allotments on the Umatilla Indian Reservation were made under the act of March 3, 1885, and not under the Dawes Act. The court there made some reference to the fact that citizenship had been conferred on the Indians and observed that the fact that citizenship had been conferred rendered their relation to the government somewhat uncertain and anomalous. The authorities, however, are quite clear and the reasons on which they rest are unquestionable that the citizenship of the Indian is not inconsistent with the right and power of the government to make any reservation with reference to its jurisdiction over the lands it grants the Indians, either for a limited or an indefinite period of time. (*Tiger v. Western Investment Co.*, 221 U. S. 286, 31 Sup. Ct. 578, 55 L. ed. 738; *Cherokee Nation v. Hitchcock*, 187 U. S. 294, 23 Sup. Ct. 115, 47 L. ed. 183; *United States v. Rickert*, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. ed. 532; *In re Heff, supra.*)

The government, as the owner of land, may attach any condition it sees fit upon parting with its title, or it may grant a qualified and limited estate and reserve the right to control the property, or restrain or entirely forbid the alienation of the property. This is clearly what the government has attempted to do in all cases of Indian allotments. It retains a kind of guardianship over the allottee in his dealing with such property. It is true that there is a kind of twilight zone between federal and state jurisdiction under the grant by Congress to the Indian of full right of citizenship on the one hand, and the reservation by the government on the other hand of a partial or limited right of guardianship over such Indian, and the federal authorities have not yet furnished any light sufficiently clear to fully penetrate

this zone, but we are not under the necessity in this case of traveling in that latitude. (*Yakima Joe v. To-is-lap,* 191 Fed. 516.) To our minds' this case is wholly governed and controlled by the act of February 8, 1887, and the federal decisions construing and interpreting its provisions.

The contention that the state has no jurisdiction over the territory formerly comprising the Nez Perce Indian Reservation is without merit. Whatever force there may have been in this contention prior to the opening of the reservation and while it was still *tribal property* and "Indian country" *in fact,* there can be no basis for such a position now that the Indian title has passed to the government and the country has been opened to settlers and homesteaders, and where an Indian lives on a forty, eighty or hundred and sixty acre allotment and his neighbors all around him are white settlers who hold fee simple title to their lands. If, on the other hand, the state has jurisdiction *everywhere except on an Indian allotment,* it would be "government in spots" only, and the civil and police officers of the state would have to go armed with the latest revised maps and plats from the general land office in order to know where and when they could exercise the authority of the state in bringing offenders against its laws to justice. The Nez Perce Indians are now citizens, and citizenship and Indian tribal relations are wholly inconsistent. Clearly the land does not belong any longer to an Indian tribe. On the other hand, a great portion of it has been patented to white settlers while individual Indians hold trust patents for the various tracts to which they are promised eventual fee simple title. It seems to us that the state has the same civil and criminal jurisdiction over a Nez Perce Indian allotment as it has over any other land within the state to which the title is still vested in the United States.

We conclude that the district court had jurisdiction to try the appellants in this case.

There is another question presented in this case which merits serious consideration.

On the trial of the case, after the state had introduced its evidence, the defendants took the witness-stand and explained their movements and denied the commission of the crime. While the defendant Jabeth was on the witness-stand, after denying that he took the animal or had anything to do with its larceny, the county attorney handed him a writing and asked him if he recognized the signature. The witness said it looked like his. He was then asked if he had not acknowledged the instrument before a notary public, and the witness denied doing so and said he had no recollection of it. The prosecuting attorney apparently read extracts from this writing and asked the witness if he had not made such statements at Lapwai on the 24th of June before S. J. Maxwell, a notary public, and the Indian agent Sharpe in accordance with the statements read. The witness denied doing so. After defendants rested their case the state on rebuttal called a witness, who seems to have been an Indian, for the purpose of identifying the signature to the instrument previously shown to Jabeth, and after in a manner identifying the signature, offered the instrument in evidence. The defendants' counsel objected, the objection was overruled and the instrument was admitted. This statement comprises about three typewritten pages and purports to have been made under oath and subscribed before Stat J. Maxwell, a notary public, on the 24th day of June, 1911. This statement, so far as we can glean from the record, appears to have been made at the Indian jail at Fort Lapwai the day Jabeth was arrested. This, however, is established more by inference than by proof. It appears, and is not disputed, that Jabeth had been drinking the day he was arrested and is supposed to have made this statement. This statement purports to be a detailed account of the movements of the defendants from prior to the theft of the animal up to the time of their arrest and is at least a partial admission that the defendants committed the larceny. This statement is attested by Maxwell as notary public, and so far as we can gather by the questions propounded by the prosecuting attorney, we would infer that it was made in the presence of the Indian agent, Sharpe.

Neither Maxwell nor Sharpe was called as a witness, nor did they testify to the statements made by Jabeth or the conditions or circumstances under which it was made. Jabeth denies making the statements—says he had been drinking some on that day; and over and above all this the record discloses that he was a full-blooded Indian boy only nineteen years old. This statement or confession was admitted on the ground that it contradicted Jabeth's evidence given on the witness-stand and that it tended to impeach him. It was inadmissible for that or any other purpose, under the circumstances. It could only have one effect upon the jury, and that was to prove an admission of guilt. They would undoubtedly give more attention to this document than to any other evidence in the case. It was therefore important to the jury to know the facts and circumstances under which the statement was made, and this evidence was peculiarly under the control and within the knowledge of the state. The state must be fair. If such a statement as this was to be introduced for the purpose of impeachment or contradiction, the conditions and circumstances under which it was made should first be shown, and that is especially true where an ignorant Indian is being tried. It is not even shown in this case that the Indian ever in fact made the statements contained in this writing. The original has not been produced in this court, but it is evident to us that the Indian did not write the statement and that it was written by someone else. And yet the jury were not advised as to the conditions or circumstances under which it was made nor as to the condition of the Indian when the statement was made, if made at all, or if any promises or inducements were offered or any duress used. An Indian must have a fair trial under the forms and rules of law the same as anyone else, and it is clear that these Indians have not had such a trial.

The judgment should be *reversed,* and it is so ordered and a new trial is granted.

Stewart, C. J., and Sullivan, J., concur.